## Hudson, House & Cogar v. Clarke Plumbing Company.

(Decided December 8, 1922.)

### Appeal from Boyle Circuit Court.

Contracts—Construction.—Parties to contracts and other writings, which are couched in doubtful and obscure language, are bound by the construction which they gave and placed upon the contract by their actions, words, and conduct in executing it, and it is the

duty of the court to accept such construction as the true one and to instruct the jury accordingly.

CHAS. H. RODES, GEO. E. STONE and NELSON D. RODES for appellants.

HENRY JACKSON and PURYEAR & CLAY for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

In the summer and fall of 1917, appellants and plaintiffs below, composing the firm of Hudson, House & Cogar, were engaged in the hemp growing business in Boyle county and they had rented for three years a farm suitable for the purpose and containing about three hundred acres. Appellees and defendants below, composing the firm of Clarke Plumbing Company, were and had been for a long time engaged in the plumbing business, including fitting together of machinery. Along in the summer of that year plaintiffs conceived the idea of constructing a hemp dryer and procured one or more firms to make figures and perhaps draw plans for the construction of one, which plans they submitted to defendants for estimates on the cost of construction, but they were not accepted because of the excessively high cost. Some time thereafter one of the defendants was in Cincinnati, Ohio, and met the defendant, F. E. Siebenmann, who was a professional designing engineer of heating plants, power plants and other similar structures. Defendants had theretofore worked in connection with Siebenmann in the installation of plants of which he was the engineer and he was induced to undertake the making of the plans and specifications for a hemp dryer to be installed by plaintiffs. Subsequently Siebenmann sent to defendants plans and specifications for the dryer, which was estimated to cost without carriage the sum of $7,158.42, which was presented to Hudson, a member of the firm, and he objected because it did not include the entire cost of carriage, etc., whereupon the senior member of the defendant firm, who carried the specifications to Hudson, estimated the cost of the omitted items to be $337.00, or a total cost of $7,495.42. Following that and on November 23, 1917, there was presented to plaintiffs for signature a writing prepared by Siebenmann, the first part of which says:

"Specifications for the installation of hemp dryer as per plans and specifications prepared and furnished by

F. E. Siebenmann, engineer, Cincinnati, O., and contractor for Hudson, House & Cogar, Danville. Kentucky.

"The contractor agrees to furnish material and labor to complete hemp dryer exclusive of carpenter work and fuel to operate and test out plant, as described herein for the net sum of seventy-four hundred and ninety-five dollars and 42/100.   $7,495.42.   Payments as follows: Eighty-five per cent to be paid on material delivered on the premises and work installed where dryer is located, remaining fifteen per cent to be paid when plant is tested out and contract complied with.

"The different materials used, also workmanship, fully guaranteed free from defects of any kind.  Should any defects occur within one year from date, same will be made good and replaced without cost to the owners. The guarantee also covers the efficiency and capacity of the plant as specified."

Then followed a minute description of the material to be used in the construction of the dryer and it is then stated: "The dryer in its entirety is guaranteed to dry from fifteen to twenty thousand pounds of hemp containing ten per cent saturation in eight (8) hours variable speed.  Any failure on the part of said drying plant to do as above specified will be reconstructed by said F. E. Siebenmann without cost to the owners."

The stipulation is then added by which the contractors agree to build the dryer by the 26th day of December, 1917, excepting named contingencies which are not necessary to mention.  That paper is signed by "Hudson, House & Cogar, owners by Hudson," and by "F. E. Siebenmann, engineer," and there is a blank line followed by the word "contractors," but no name is written thereon.  Hudson testified, and he was corroborated by a witness named Davis, that both Clarke and Seibenmann came to Hudson's office on that day with the prepared writing and that both he and Seibenmann signed it at the time; while Clarke testified that Siebenmann was not present and that the writing had already been signed by him when received by Clarke and was signed by Hudson in the latter's office when Clarke alone presented it.  It will be observed that the fixed cost included both material and labor minus carpenter work and fuel to test the plant.

Within a few days thereafter defendants were shown by plaintiffs the site upon which to construct the dryer and they immediately began work thereon, some of the materials for which were shipped to defendants before

the writing was signed by Hudson. The building was not finished because of weather conditions and other interfering causes until some time in March, 1918, but no test of it was made at that time because plaintiffs say that in the meantime they had broken their entire crop of hemp and had none left with which to make the test. The building enclosing the machinery was locked by plaintiffs, but the roof was blown off and the machinery became more or less damaged, and in the late fall of 1918, after repairing the damage, a test was made, but as to the extent of it the testimony is contradictory. However, it was found that the dryer, though constructed according to the plans, would not perform the work and was without value for the purposes intended.

This action was filed by plaintiffs against Siebenmann and the Clarke Plumbing Company to recover damages for the failure to construct the plant within the time agreed upon, and for its failure to perform the work, the total amount of which, as alleged in the petition, was $11,251.10. Siebenmann tendered an answer but the court, on objections by plaintiffs to its being filed, sustained their objections, and a jury, empanelled to assess the damages against him, returned a verdict in favor of plaintiffs for $6,731.10, upon which judgment was rendered and from which no appeal is prosecuted. The Clarke Plumbing Company denied that they were either contractors or subcontractors in the construction of the plant but that plaintiffs contracted with Siebenmann for plans and specifications for the construction of the plant and that plaintiffs, through Siebenmann, their engineer, employed appellees to construct the plant according to the plans and specifications and they were to receive therefor ten per cent of the estimated cost according to the plans, or a sum of $749.55, plus all extra material and labor used in the construction and not contained in the specifications. They alleged that they had paid for all the material specified in the plans and specifications as well as extras, and that such payments plus their percentage amounted to $9,902.18, only $6,371.11 of which plaintiffs had paid and by counterclaim asked judgment against plaintiffs for $3,531.07. Before trial plaintiffs filed, over the objections of defendants, an amended petition in which they withdrew the averments in their petition that the Clarke Plumbing Company was a co-contractor with Siebenmann and alleged that they were subcontractors under him and withdrew their prayer for any

judgment against appellees. Appropriate pleadings made the issues and upon a jury trial under the instructions of the court, a verdict was returned in favor of appellees against appellants for the sum of $2,458.20, upon which judgment was rendered and the court declining to set it aside on a motion for a new trial plaintiffs prosecute this appeal.

The grounds urged for a reversal are, that the court erred in giving to the jury instruction number 1, and erred in refusing to give instruction "Z," offered by plaintiffs. Both of these grounds are bottomed upon the contention that it was the duty of the court, under the evidence, to adjudge without submitting that issue to the jury, that Siebenmann was the contractor for the construction of the hemp dryer and that appellees were subcontractors under him and that the only issue which should have been submitted to the jury was the value of the extra work and material, not included in the plans and specifications, performed and furnished by defendants at the instance and request of plaintiffs. White Star Coal Co. v. Pursifull, 186 Ky. 697. Instruction 1, complained of, told the jury, in substance, that if they believed Siebenmann was only an engineer and designer to draw the plans and was not a contractor to build the hemp dryer and that he, with the knowledge and consent of plaintiffs, employed defendants to do the work at the agreed percentage and to pay for extra labor and material and that appellees did the work under such contract with Siebenmann as the agent of plaintiffs in a skillful and workmanlike manner and furnished extra labor and material at the request of plaintiffs, then it was their duty to return a verdict in favor of defendants for the amount of the contract price plus the cost of extra labor and material not to exceed the sum of $3,521.07. In instruction 2 the jury were told to return a verdict only for the extra labor and material furnished by appellees at plaintiffs' request if they believed that Siebenmann was not only engineer but also contractor for the construction of the hemp dryer. The latter instruction was in substance the same as instruction "Z" offered by plaintiffs and the real question, therefore, is whether the court erred in giving to the jury instruction number 1, which, as we have seen, left it for them to determine the legal effect of the writing signed by plaintiffs on November 23, 1917, i. e., whether it was executed by Siebenmann only as engineer, or as both engineer and contractor.

It is contended by appellants that it is the duty of the court to construe a writing and which general proposition counsel for defendants concede, but they claim that where the writing is ambiguous and susceptible to more than one construction it is competent for the jury to pass upon its effect in the light of the evidence adduced.

Without stopping to discuss either position of counsel, we think the testimony in the record establishes, without material contradiction, that the conduct of the parties from the beginning to the filing of the action construed that writing as a contract by Siebenmann to construct the hemp dryer whatever else it may have contained or other effect that may be given it. White Star Coal Co. case, *supra*.

Practically all of the testimony supporting the contention of defendant, Clarke Plumbing Company, is that given by T. E. Clarke, the senior member of the firm, who testified that on the day the writing was signed, and when he claimed that no one was present except himself and Hudson, the latter requested the signature of the Clarke Plumbing Company and witness declined to sign it and stated at the time "I am not contracting," whereupon he was asked by Hudson, "How are you working?" to which witness answered, "I am working on a percentage," and that Hudson then signed the writing and said to witness, "Now you can go ahead," and that pursuant to that instruction he accepted direct employment from plaintiffs to construct the hemp dryer according to the plans and specifications furnished by Siebenmann. That conversation is denied by both Hudson and Davis, but whether true or not, in the light of the overwhelming testimony in the case, we are not disposed to give to it the construction contended for by defendants' counsel.

Five days after that writing was signed, Clarke went to Cincinnati to confer with Siebenmann with reference to the latter having shipped material in defendants' name and while there Siebenmann and Clarke, for his company, signed a contract which is designated "Agreement to construct hemp drying plant and erect machinery for same by and between F. E. Siebenmann, engineer, Cincinnati, Ohio, for Hudson, House & Cogar, Danville, Kentucky, and Clarke Plumbing Company, a firm of contracting plumbers and steamfitters, of Danville, Kentucky." The writing then continues and binds Siebenmann to procure plaintiffs to pay to the Clarke Plumbing Company, "as subcontractors" ten per cent of the cost

stated in the writing which was executed between Sieben-
mann and plaintiffs and to receive payment for all extra
material and labor, and it was further stipulated therein
that Clarke Plumbing Company should not be liable for
the efficiency or capacity of the dryer and that their obli-
gations cease when the dryer is set in motion and run for
eight hours. That contract was never presented to plain-
tiffs and they knew nothing of it until after the institu-
tion of this suit. After that, as well as before, all ma-
terial was shipped to Clarke Plumbing Company who
paid therefor. On the same day of the execution of that
writing Siebenmann gave Clarke an order to plaintiffs
saying: "Pay to the order of Clarke Plumbing Company
(sub) contractors on the hemp dryer contracted for.
Payments on material and labor as deliveries are made
and work installed as per contract 85 per cent." Pursu-
ant to that order defendants presented their first esti-
mate to plaintiffs on December 22, 1917, for labor and
material amounting at that time to $2,927.42, and they
were paid 85 per cent of it for which a receipt was given
in the name of Siebenmann "by B. J. Clarke." A second
estimate was presented on January 3, 1918, and receipted
in the same manner, while the third and final one was
presented on January 21, 1918, accompanied with the
same receipt. In each of the estimates it was stated that
the contract price was $7,495.42, the same as mentioned
in the contract of November 23, 1917, and the third and
last one equaled the total of 85% of that sum. After the
work ceased in March, 1918, defendants wrote several let-
ters to different persons, one of which was addressed to
Siebenmann and the others to parties who had furnished
material upon his order. In the letters to the furnishers
of material it is stated: "Mr. Siebenmann is both engi-
neer and contractor on this job," and "The owners in-
sisted on dealing with one man, so Mr. Siebenmann be-
come contractor and engineer and signed the contract to
build the dryer." In one of them the statement is made
that Clarke Plumbing Company expected Siebenmann to
pay it the balance due "Which exceeds what is coming to
him by the amount mentioned in this letter," which was
at that time $1,042.37 more than the contract price. In
their letter to Siebenmann defendants said: "You not
only entered into an agreement to make plans, you
agreed to assume the entire contract and copies of your
correspondence to Hudson, House & Cogar will prove
this statement." He is charged in that letter with omit-

ting certain material, and it is then stated, "The writer, on account of our standing in the community, is willing to lose our per cent of profit, our time and the business we sacrificed during the time we were getting the dryer in shape." In another letter it is stated that defendants had erected for plaintiffs a plant worth $9,500.00 for $7,495.42, and that "you can class us as doing the work, time and material and our charge is against Mr. Siebenmann and what collections are made are by order from him." The contract which defendants made with Siebenmann on November 28, 1917, the order of the latter to plaintiffs to pay defendants 85 per cent of the estimated cost as the work proceeded, the estimates furnished and payments made to the extent of 85 per cent as the work progressed, and the statements made by defendants in their various letters furnish convincing proof that they were working under an arrangement with Siebenmann independently of any employment by plaintiffs. This is not only proven by the statements of defendants in their letters but it is established by the circumstances. If they were working under direct employment by plaintiffs, why should they pay for the material, or why should it be shipped to them? Furthermore, if that were true, why the necessity of getting an order from Siebenmann for plaintiffs to make any payments as the work progressed, and why should only 85 per cent of the bills presented be paid instead of the full amount of them? The testimony is thoroughly convincing that at the time plaintiffs signed the contract with Siebenmann on November 23, 1917, there existed some contractual arrangement between defendants and Siebenmann whereby the former were to "work on a percentage," and well might Hudson have then replied "Well, go ahead" without incurring any contractural obligation with defendant.

But it is said that a letter written by defendants to plaintiffs on the day before that order was given shows that its effect was to create a direct employment of defendants by plaintiffs to do the work. The material parts of that letter are: "We want something from you to decide definitely what we are to do in reference to the part of the work for hemp dryer we have contracted for with Mr. Siebenmann, namely: . . . The carier is being made and Mr. Siebenmann is looking after same, other material we understand is shipped. . . . However, we do not propose to be the goat and intend to withdraw from the job unless advised to proceed, as we have failed

to locate Mr. Siebenmann up to this writing, who is in Pittsburg, Penn., and will not return to Cincinnati until Saturday next.'' The trouble sought to be avoided by that letter, as we interpret it, was the uncertainty as to when defendants should begin the work, or as to whether the plant would be constructed at all, since defendants were already obligated for consigned material and they wanted to make sure of the fact that it would be used and paid for under the terms of Siebenmann's contract, and to be enabled to collect the percentage due under that contract before the bills for the material became due, and when they were informed by Hudson to ''go ahead,'' which meant to immediately commence the work, the purpose of that letter was fulfilled. That such was the meaning of the letter is fortified by the fact that defendants knew what they were to get if they undertook the work because they so informed Hudson on the next day when he was told that they were to do the ''work on a percentage,'' though Hudson knew nothing of the rate of percentage, and if defendants' contention be true plaintiffs would be in the attitude of contracting without knowing what they were to pay.

The whole course of the conduct of the parties throughout the negotiations indisputably establish the facts that Siebenmann was the contractor and that defendants were working under him on a percentage basis as subcontractors, and the court should have so held. In that case the only amount which defendants were entitled to recover was the value of the extra material and labor above the sum of $7,495.42 which they furnished and performed at the instance and request of plaintiffs, all of which is included in offered instruction ''Z,'' and it should have been given.

It is insisted, however, that in that view of the case the evidence shows that such extra material and labor amounted to more than the verdict and the judgment for that reason should be affirmed, but it is quite manifest that counsel is in error as to the premise upon which that contention is made.

Wherefore, the judgment is reversed with directions to grant a new trial and for proceedings consistent with this opinion.